STATE OF CONNECTICUT *v.* EMANUEL SMITH
(SC 16254)

McDonald, C. J., and Borden, Norcott, Katz and Sullivan, Js.*

---

* Although Chief Justice McDonald reached the mandatory age of retirement before the date that this opinion was officially released, his continued participation on this panel is authorized by General Statutes § 51-198 (c). The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued November 29, 2000—officially released July 31, 2001

*Eileen McCarthy Geel*, assistant state's attorney, with whom were *Matthew Couloute, Jr.*, assistant state's attorney, and, on the brief, *Eugene Callahan*, state's attorney, for the appellant (state).

*Lauren Weisfeld*, assistant public defender, for the appellee (defendant).

*Opinion*

MCDONALD, C. J. The defendant, Emanuel Smith, was arrested and charged with possession of narcotics in violation of General Statutes § 21a-279 (a),[1] posses-

---

[1] General Statutes § 21a-279 (a) provides: "Any person who possesses or has under his control any quantity of any narcotic substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than seven years or be fined not more than fifty thousand dollars, or be both fined and imprisoned; and for a second offense, may be imprisoned not more than fifteen years or be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for any subsequent offense, may be imprisoned not more than twenty-five years or be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

sion of narcotics with intent to sell or dispense by a person who is not drug-dependent in violation of General Statutes § 21a-278 (a),[2] possession of narcotics with intent to sell or dispense within 1500 feet of a public housing project in violation of General Statutes § 21a-278a (b),[3] and interfering with an officer in violation of

[2] General Statutes § 21a-278 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person one or more preparations, compounds, mixtures or substances containing an aggregate weight of one ounce or more of heroin, methadone or cocaine or an aggregate weight of one-half gram or more of cocaine in a free-base form or a substance containing five milligrams or more of lysergic acid diethylamide, except as authorized in this chapter, and who is not, at the time of such action, a drug-dependent person, shall be imprisoned for a minimum term of not less than five years nor more than twenty years; and, a maximum term of life imprisonment. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

[3] General Statutes § 21a-278a (b) provides: "Any person who violates section 21a-277 or 21a-278 by manufacturing, distributing, selling, prescribing, dispensing, compounding, transporting with the intent to sell or dispense, possessing with the intent to sell or dispense, offering, giving or administering to another person any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278. To constitute a violation of this subsection, an act of transporting or possessing a controlled substance shall be with intent to sell or dispense in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place. For the purposes of this subsection, 'public housing project' means dwelling accommodations operated as a state or federally subsidized multifamily housing project by a housing authority, nonprofit corporation or municipal developer, as defined

General Statutes § 53a-167a (a).[4] The defendant moved to suppress certain evidence and to dismiss the charges against him. After a hearing, the trial court granted the defendant's motions. The state, on granting of permission by the trial court, appealed to the Appellate Court from the judgment dismissing the information, and this court transferred the case to itself pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal, the state claims that the trial court improperly granted the motion to suppress. Because we conclude that the search was conducted under exigent circumstances and was supported by probable cause, we reverse the judgment of the trial court.

The trial court, in its oral decision, documented by way of the transcript, found the following facts: "Officer Larry Eisenstein, a veteran member of the Stamford police department together with some colleagues, received information from a confidential informant. Officer Eisenstein was on duty, received a call from a confidential informant who said a motor vehicle was parked at 186 Greenwich Avenue [Stamford], a public housing residential building. [The informant] said that a car was in the lot described as an Olds[mobile] Cutlass . . . bearing Connecticut registration 679 MBX. Officer Eisenstein [had] work[ed] with the confidential informant since 1990 and recently and [on] over ten occasions received reliable information leading to the successful arrest, seizure and convictions of other defendants, and in excess of thirty since 1990.

"The informant provided Officer Eisenstein with information that the said motor vehicle contained an

---

in section 8-39, pursuant to chapter 128 or by the Connecticut Housing Authority pursuant to chapter 129."

[4] General Statutes § 53a-167a (a) provides: "A person is guilty of interfering with an officer when he obstructs, resists, hinders or endangers any peace officer or fireman in the performance of his duties."

unspecified quantity of contraband, specifically, crack cocaine inside of the motor vehicle. The confidential informant further stated that the vehicle was operated by a black male who was described as 6 feet, over 200 pounds, who was in the company of a female known to the confidential informant as Marlene.

"The officer set up a surveillance following the receipt of that information. Upon arrival at the location the [officers] confirmed the information provided by the confidential informant with respect to the location and description of the motor vehicle, and the presence of a black male fitting the description. The surveillance was conducted for a period of about fifteen minutes. During which time no drugs were seen by the police officer nor were any transactions observed.

"But the police officer did observe a black male fitting the description later found and identified as the defendant . . . approaching the vehicle leaning down from his waist to the driver's side of the motor vehicle.

"The police moved in and [the defendant] fled on foot, and he attempted to cross a bridge. He was apprehended approximately 100 feet from the location of said motor vehicle. The defendant fought the police who identified themselves as police officers with a badge plainly displayed during the pursuit and during the resistance. The defendant was wrestled down. The keys were taken from the defendant.

"The confidential informant has prior arrests for drug possession and in fact has a pending case in the Stamford judicial district. The confidential informant did not know the defendant but did know his companion Marlene. The confidential informant never provided information that he saw Marlene handle drugs nor did he say the defendant handled drugs. The confidential informant never . . . purchased . . . drugs from the defendant nor Marlene, however, the confidential infor-

mant is in fact known at least to Officer Eisenstein to be a drug user. When the defendant was apprehended, no drugs were found on his person. The police had previously determined prior to moving in that the car was registered to someone other than the defendant and his companion. Specifically . . . Acarde Andre Dozier.[5]

"The police officer determined that the defendant was Emanuel B. Smith, Jr. after apprehending him and seizing a pager and some cash. The confidential informant never saw drugs being placed in the motor vehicle. The confidential informant did not witness nor participate in the crime. At this time of the search and subject seizure the motor vehicle was unoccupied and locked by the defendant with keys in his possession. The defendant was not in the car. There were no plain view circumstances wherein contraband was seen by the police officers in the car nor were there any [exigent] circumstances at the time of the search of the automobile."

On the basis of these facts, the trial court stated that the confidential informant's "basis of knowledge" was "at issue." The trial court concluded that the informant's information and the officer's observations were insufficient to establish probable cause. The court also concluded, however, that there were no exigent circumstances to justify the search.[6] Accordingly, the court found that the search violated the defendant's right to be free from an unreasonable search under the

---

[5] Although the defendant did not own the vehicle, he did have access to it, and thus we will refer to it as the defendant's vehicle.

[6] Eleven bags of crack cocaine had been found in the defendant's vehicle.

fourth amendment to the United States constitution[7] and article first, § 7, of the constitution of Connecticut.[8] The court ordered that evidence of the crack cocaine found in the vehicle by the police be suppressed.

"As a threshold matter, we set forth the appropriate standard pursuant to which we review a challenge to a trial court's granting of a suppression motion. This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court. . . . In other words, to the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous. Where, however, the trial court has drawn conclusions of law, our review is plenary, and we must decide whether those conclusions are legally and logically correct in light of the findings of fact." (Citations omitted; internal quotation marks omitted.)

---

[7] The fourth amendment to the United States constitution, made applicable to the states through the due process clause of the fourteenth amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[8] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

*State* v. *Velasco*, 248 Conn. 183, 188–89, 728 A.2d 493 (1999).

The state challenges the trial court's legal conclusion that the search of the vehicle was not supported by probable cause. In deciding that probable cause existed to search the car, we engage in plenary review. Id., 189–90.

"Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched." (Internal quotation marks omitted.) *State* v. *Vincent*, 229 Conn. 164, 171, 640 A.2d 94 (1994). The determination of whether probable cause exists under the fourth amendment to the federal constitution, and under article first, § 7, of our state constitution, is made pursuant to a "totality of circumstances" test. *Illinois* v. *Gates*, 462 U.S. 213, 231–32, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *State* v. *Barton*, 219 Conn. 529, 544, 594 A.2d 917 (1991). Under the *Gates* test, a court must examine all of the evidence relating to the issue of probable cause and, on the basis of that evidence, make a commonsense, practical determination of whether probable cause existed. See *State* v. *Barton*, supra, 544. We have said that the question is whether there was a fair probability that the contraband was within the place to be searched. *State* v. *Vincent*, supra, 172.

In *Gates*, the United States Supreme Court abandoned its previous test for probable cause based upon informant reports as set forth in *Aguilar* v. *Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), and *Spinelli* v. *United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). The *Aguilar-Spinelli* test had two independent prongs, the "reliability" of the infor-

mant and "the basis of his knowledge." *Illinois* v. *Gates*, supra, 462 U.S. 242. This court at first refused to apply the *Gates* test to informant reports under the Connecticut constitution. See *State* v. *Kimbro*, 197 Conn. 219, 236, 496 A.2d 498 (1985). In *State* v. *Barton*, supra, 219 Conn. 544–45, however, this court held that we should apply the *Gates* "totality of the circumstances" test to such reports under our state constitution. Although the "reliability" and "basis of knowledge" prongs are now no longer independent issues, they may nevertheless "illuminate the common-sense, practical question of the existence of probable cause" under the totality of the circumstances. (Internal quotation marks omitted.) *State* v. *Velasco*, supra, 248 Conn. 192. As the United States Supreme Court stated in *Gates*, "a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Illinois* v. *Gates*, supra, 233. The court held in *Gates* that, where confirmation from other sources such as police investigation exists, the police "could properly conclude that it was not unlikely that [the informant] also had access to reliable information of the [defendant's] alleged illegal activities." Id., 245. The court stated that "[i]t is enough that there was a fair probability that the [informant] had obtained his entire story either from the [defendants] or someone they trusted." Id., 246. As Justice White observed in his *Gates* concurrence, informant reports require "some showing of facts from which an inference may be drawn that the informant is credible and that his information was obtained in a reliable way." Id., 273.

As to the informant's "reliability" in this case, we have consistently held that an informant's record of providing information that led to arrests and seizures of contraband is sufficient to establish the reliability of the informant. See *State* v. *Respass*, 256 Conn. 164,

175–76, 770 A.2d 471 (2001); *State* v. *Rodriguez*, 223 Conn. 127, 136, 613 A.2d 211 (1992); *State* v. *Morrill*, 205 Conn. 560, 567, 534 A.2d 1165 (1987). In the present case, the trial court found that: "Officer Eisenstein [had] work[ed] with the confidential informant since 1990 and recently and [on] over ten occasions received reliable information leading to the successful arrest, seizure and convictions of other defendants, and in excess of thirty since 1990." Accordingly, we conclude that this record of past reliability was sufficient to find that the confidential informant was reliable.

The defendant argues that the trial court properly concluded that the informant's basis of knowledge was insufficient because neither the informant nor the officers had seen cocaine in the car or upon the defendant's person, nor had the informant bought drugs from the defendant. We conclude, however, that the trial court's requirement of firsthand visual knowledge of the presence of drugs or of buying drugs went beyond the requirements of *Illinois* v. *Gates*, supra, 462 U.S. 231–32, and *State* v. *Barton*, supra, 219 Conn. 544. We conclude that the informant's overhearing of the defendant planning or admitting criminal activity constituted a type of firsthand knowledge formerly required under *Aguilar* and "highly relevant" under *Gates*. "Generally, it may be said that the surest way to establish a basis of knowledge is by a showing that the informant is passing on what is to him first-hand information . . . [as] when a person indicates he has overheard the defendant planning or admitting criminal activity . . . ." 2 W. LaFave, Search and Seizure (3d Ed. 1996) § 3.3 (d), pp. 141–42.[9]

---

[9] Officer Eisenstein testified as follows: "The informant stated to me that there was a vehicle parked in the parking lot of 186 Greenwich Avenue . . . . The informant described the vehicle as being an old [Oldsmobile] Cutlass, color gray, two door with a blue vinyl roof with a Connecticut plate on the back of the vehicle 679 [MBX]. . . . [The informant] [s]tated [that] inside this vehicle was an unspecific quantity of crack cocaine and that the vehicle was being operated by a black male, approximately 6 feet tall over

We also conclude that the police investigation confirming details of the informant's report may establish that the informant obtained the information in a reliable way. In *Gates*, an anonymous letter to the police stated that after Gates flew to Florida he would be driving his family car from Florida to Bloomington, Illinois, and that he would have drugs in it. *Illinois* v. *Gates*, supra, 462 U.S. 225. Police investigation confirmed his travel arrangements. Id., 226. A search warrant for the vehicle was obtained and Gates' car was searched as he returned to Illinois. Id. In *Gates*, the unknown informant's basis of knowledge was not spelled out and the informant's past reliability was necessarily unknown. Id., 227. Nevertheless, the court held that corroboration by the police by investigation of Gates was sufficient to establish probable cause. Id., 241–46.

In this case, the trial court found that the police surveillance confirmed that the vehicle was where the informant said it would be. As the trial court found, the police observed the defendant, who matched the informant's description, approach the vehicle, open it and bend at the waist into the front seat. He then fled from the vehicle when the police officers approached him. We conclude that probable cause to believe the vehicle contained the drugs was established under *Gates* and *Barton*. In the words of *Gates*, this "all indi-

---

200 pounds, muscular build, beard and mustache, wearing a black tee shirt, blue jeans and white sneakers. . . . He was in the company of a black female who the [confidential informant] referred to as Marlene." When Eisenstein was asked how the informant had learned this information, he stated that the informant "had overheard a conversation between Marlene and the black male subject prior to them leaving the area to go get the quantity of crack." Later, under cross-examination, Eisenstein testified as follows: "The way the information was stated to me, the conversation was that these two people were going to get drugs and bring them back to this location. That they were already back at the location and the drugs were in the vehicle and that the conversation that . . . transpired between Marlene and [the defendant] was . . . something to the effect that the drugs were in the vehicle."

cated, albeit not with certainty, that the informant's other assertions also were true." Id., 244. Here, as in *Gates,* the police could infer that there was a fair probability that the information came, as Eisenstein testified, from the defendant or someone whom he trusted.

As *Gates* points out, basis of knowledge no longer has an "independent status" as to probable cause. Id., 230. Under the *Gates* definition of probable cause, self-verifying detail such as the location of the vehicle and the description of the defendant and the use of the vehicle to keep something in the vehicle may lead one to conclude that the information is not merely a "casual rumor." 2 W. LaFave, supra, § 3.3 (d), p. 141. Partial corroboration of the informant's report by facts developed by police also may be considered as was done in *Gates.* In this case, the police observed the defendant approach the vehicle, reach into the floorboard area and flee when he saw the officers approaching him. His flight was suggestive of criminal activity in itself and supports a finding of probable cause. Cf. *Illinois* v. *Wardlow,* 528 U.S. 119, 124–25, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (police officer justified in suspecting criminal activity when suspect fled after seeing police).

We conclude that a commonsense, practical basis for finding probable cause existed. Considering all of the circumstances leading up to the search—the informant's known reliability and his detailed report as to the use of the car to store cocaine, the informant's accurate descriptions of the defendant and the car, his personal knowledge of the defendant's companion, Marlene, and the defendant's flight from the car after seeing the police—a proper application of *Gates* and *Barton* would support a fair probability that contraband would be found in the defendant's car. Accordingly, we conclude that the trial court improperly concluded that probable cause was lacking to support a search of the vehicle.

The state also argues that the trial court improperly concluded that the search was unreasonable because it found that "there were no exigent circumstances for a warrantless search . . . ." We agree. The "automobile exception" is premised, in part, upon the inherent mobility of automobiles; see *California* v. *Carney*, 471 U.S. 386, 390–91, 105 S. Ct. 2066, 85 L. Ed. 2d 406 (1985); *State* v. *Januszewski*, 182 Conn. 142, 155, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981); and that *inherent mobility itself* creates exigent circumstances. *State* v. *Kolinsky*, 182 Conn. 533, 540, 438 A.2d 762 (1980), cert. denied, 451 U.S. 973, 101 S. Ct. 2054, 68 L. Ed. 2d 354 (1981) (exigency when "defendant's car [was] inherently mobile . . . [and] it was parked on a public street where access was not meaningfully restricted"); *State* v. *Januszewski*, supra, 155 ("an automobile is, usually, inherently mobile and, thus, presents a continuing possibility of being moved").

"Under both the federal and the state constitutions, the police must first obtain a warrant before conducting a search, unless an exception to the warrant requirement applies. See *Katz* v. *United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (warrant required before every search or seizure, subject only to a few specifically established and well-delineated exceptions . . .) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Longo*, 243 Conn. 732, 737, 708 A.2d 1354 (1998). One of these recognized exceptions to the warrant requirement is the so-called "automobile exception." *State* v. *Badgett*, 200 Conn. 412, 428–29, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986).

"The justification for . . . [the] 'automobile exception' is twofold: (1) the inherent mobility of an automobile creates 'exigent circumstances'; and (2) the expectation of privacy with respect to one's automobile

is significantly less than that relating to one's home or office." Id., 428.

The United States Supreme Court has placed an increasing emphasis on the reduced expectation of privacy justification for the "automobile exception." See 3 W. LaFave, supra, § 7.2 (b), pp. 476–77. In *California v. Carney*, supra, 471 U.S. 391, the court stated that "[e]ven in cases where an automobile [is] not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception." Thus, under the fourth amendment, a warrantless vehicle search does not require a showing of exigent circumstances. See *Maryland v. Dyson*, 527 U.S. 465, 119 S. Ct. 2013, 144 L. Ed. 2d 447 (1999); *Pennsylvania v. Labron*, 518 U.S. 938, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996).

In *State v. Dukes*, 209 Conn. 98, 120, 547 A.2d 10 (1988), we noted that, under the constitution of Connecticut, "the automobile exception permits a warrantless search of an automobile whenever the police have probable cause to do so." Later, in *State v. Miller*, 227 Conn. 363, 377, 386–87, 630 A.2d 1315 (1993), we held that a warrantless search of an impounded vehicle violated article first, § 7, of the constitution of Connecticut. Cf. *Chambers v. Maroney*, 399 U.S. 42, 51–52, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970) (warrantless search of impounded vehicle reasonable under fourth amendment). We stated: "We tolerate the warrantless on-the-scene automobile search *only* because obtaining a warrant would be impracticable in light of the inherent mobility of automobiles and the latent exigency that that mobility creates." (Emphasis in original.) *State v. Miller*, supra, 384–85. In *Miller*, we reasoned that once a vehicle is impounded, there is no continuing possibility that it will be moved, and therefore obtaining a warrant is no longer impracticable. Id., 385 n.17.

In the present case, there was a continuing possibility that the defendant's car, which was located in a parking lot accessible to a public housing building, would be moved. The vehicle was not impounded. Cf. *State* v. *Januszewski*, supra, 182 Conn. 156 (car "was parked on easily accessible property open to the public"); *State* v. *Williams*, 170 Conn. 618, 625, 398 A.2d 140, cert. denied, 429 U.S. 865, 97 S. Ct. 174, 50 L. Ed. 2d 145 (1976) ("car was seized from a public parking lot where access was not meaningfully restricted").

Accordingly, we conclude that the trial court improperly determined that no exigent circumstances existed. We conclude that under article first, § 7, of the constitution of Connecticut, the warrantless, on-the-scene search of the defendant's car was reasonable under the circumstances.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other justices concurred.